IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| DAMON A. VOLBERT, | ) | Case No. 3:20-cv-0011 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES R. KNEPP, II |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF | ) | THOMAS M. PARKER |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Defendant. | ) | |

**I.     Introduction**

Plaintiff, Damon A. Volbert, seeks judicial review of the final decision of the Commissioner of Social Security denying his application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act. This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). Because the Administrative Law Judge ("ALJ") applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Volbert's SSI application be affirmed.

**II.     Procedural History**

Volbert filed for SSI on July 14, 2017. (Tr. 16).[1] He alleged that he became disabled on March 19, 2014 due to difficulty breathing and stomach issues. (Tr. 373, 378). The Social Security Administration denied Volbert's application initially and on reconsideration. (Tr. 283, 293). Volbert requested an administrative hearing. (Tr. 298). ALJ Terry Michael Banks heard

---
[1] The administrative transcript is in ECF Doc. 10.

Volbert's case and denied the claim in a February 15, 2019, decision. (Tr. 16-28). On November 1, 2019, the Appeals Council denied further review, rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-3). On January 3, 2020, Volbert filed a complaint challenging the Commissioner's decision. ECF Doc. 1.

**III.    Evidence**

    **A.    Relevant Medical Evidence**

Volbert underwent an esophagogastroduodenoscopy ("EGD") with dilation in July 2014. The results were normal. (Tr. 740-741). The results of a second EGD on August 4, 2017 were also normal. (Tr. 779, 1048).

In June 2015, Volbert reported that he had mowed his neighbor's yard and wanted to be checked for ticks. (Tr. 585).

On October 20, 2015, Volbert reported that his main problem was that he needed a job and could not find one because he had not learned how to use a computer. When asked if he was receiving mental health services, he said that he was not depressed, but was frustrated and disappointed that he could not get a job. (Tr. 568).

Volbert received a left shoulder steroid injection on April 18, 2016 after complaining of shoulder pain. A couple weeks later, he informed hospital staff that the injection had not helped. (Tr. 540).

Volbert saw primary care provider, Christopher Smith on August 23, 2016. He reported using inhalers for his COPD and admitted that he continued to smoke. He reported being upset about the death of is brother, but denied any need for mental health services. (Tr. 520). Examination showed that Volbert's mood was pleasant; his thought process was logical and his

judgment and insight were intact. (Tr. 521). Dr. Smith gave Volbert information about Social Security assistance. (Tr. 522).

On December 7, 2017, Dayton VA General Surgery Clinic sent a letter to Volbert requesting a follow-up treatment. (Tr. 1036). At his follow-up appointment, Volbert reported that he was using inhalers to stabilize his COPD. He also reported that he had a follow-up appointment scheduled for his abdominal pain. (Tr. 1037-1038).

On April 13, 2018, Volbert spoke to a nurse about receiving treatment for a mass on his right wrist. Volbert had previously been seen by "Ortho" for a ganglion cyst and was advised that he could call them to schedule an appointment. (Tr. 1021).

On April 30, 2018, Volbert consulted with surgeon Bhoompally Reddy, M.D. for intermittent right upper quadrant abdominal pain associated with minimal nausea. (Tr. 1017). Dr. Reddy noted that Volbert had a lot of transportation problems and had taken a shuttle to Lima. (Tr. 1018).

On May 21, 2018, Volbert was advised that his EKG showed a left bundle branch block ("LBBB"), which would need to be further investigated. (Tr. 1001).

On May 29, 2019, optometrist, Amy Teresa Knapke, O.D., noted that Volbert had hyperopia/presbyopia with astigmatism as well as mixed cataracts. She recommended new glasses. (Tr. 1000).

On January 29, 2019, Volbert underwent a laparoscopic cholecystectomy to treat his cholelithiasis. (Tr. 1163).

3

**B.      Relevant Opinion Evidence**

**1.      Examining Consultant – B.T. Onamusi, M.D.**

On September 18, 2017, B.T. Onamusi, M.D., evaluated Volbert and prepared an internal medicine evaluation report. (Tr. 915-917). Volbert reported that he had daily symptoms of wheezing, shortness of breath, chest tightness and cough, requiring Atrovent and Albuterol about once a day. (Tr. 915). Dr. Onamusi noted full muscle strength, full range of motion and full ability to grasp, manipulate, pinch, and engage in fine motor coordination. (Tr. 905-908). On examination, Dr. Onamusi noted that Volbert "had no trouble transferring on or off the examination table." Under the functional capabilities section of his report, Dr. Onamusi noted that Volbert could "sit for 40 minutes, stand for 40 minutes and walk ½ block." He also noted that Volbert could "lift or carry 5 pounds." (Tr. 916). Dr. Onamusi diagnosed chronic obstructive pulmonary disease ("COPD") with no objective findings on examination, and epigastric pain probably secondary to gastroesophageal reflux disease. He then opined that Volbert would be capable of sitting without restrictions, standing frequently, walking frequently, lifting occasionally no more than 10 pounds, bending occasionally, squatting occasionally, climbing steps occasionally, and using his upper extremities for gross and fine motor tasks frequently. (Tr. 917).

**2.      Examining Psychological Consultant – Michael J. Wuebker, Ph.D.**

On October 16, 2017, Dr. Michael J. Wuebker performed a psychological evaluation of Volbert. (Tr. 920-925). Volbert reported that he had worked several jobs, and his last job ended in November 2016. (Tr. 921-922). Volbert reported that he watched television and went to the library to learn how to use a computer during the day. He took short walks, rode his bicycle and read. He visited and talked with a friend twice a week and visited his family daily. He was able

4

to prepare simple meals and do light cleaning. (Tr. 924). He reported that he had dealt with depression most of his life and with anxiety since grade school. Dr. Wuebker did not observe any symptoms of anxiety and noted that Volbert's "mood was not depressed and his affect was appropriate." (Tr. 923). Dr. Wuebker diagnosed "Other Specified Depressive Disorder – "Recurrent Brief Depression;" and "Other Specified Anxiety Disorder – Limited Symptoms Attacks." (Tr. 924). He opined that Volbert would be able to understand and apply instructions for one-step and some complex workplace instructions and that he would benefit from assistance in managing any funds awarded to him due to his brief interim of sobriety. (Tr. 925).

### 3. State Agency Consultants

On October 17, 2017, state agency reviewing consultant, Katherine Fernandez, Psy.D., reviewed Volbert's mental health records and opined that Volbert had the severe impairments of COPD, osteoarthrosis and allied disorders, depressive, bipolar and related disorders, anxiety and obsessive-compulsive disorders and substance addition disorders (alcohol). (Tr. 255-256). Dr. Fernandez opined that Volbert was moderately limited in his ability to appropriately respond to changes in the work setting. She opined that he was able to perform simple and complex tasks in a static setting where pace could vary and changes were infrequent. (Tr. 260-261).

On August November 17, 2017, Jennifer Swain, Psy.D., reviewed Volbert's mental health records and affirmed the opinions of Dr. Fernandez. (Tr. 274-275).

### C. Relevant Testimonial Evidence

Volbert testified at the ALJ hearing. (Tr. 228-242). He was 58 years old at the time of the hearing. (Tr. 38). He lived by himself. He had finished high school where he had received electronics vocational training. He had served in the military from June 1979 to June 1983. (Tr. 230). He had past work experience as a janitor. (Tr. 230-231, 235-239). He did not think he

could do that job anymore because it was too much walking and would put too much stress on his body. (Tr. 241).

Volbert had not worked much during the past 15 years - at first because he could not find a job, but by the time of the hearing, he was no longer sure if he could physically work. He testified that he had dizziness from blood pressure medication and trouble standing. (Tr. 232). He also had problems gripping, holding and lifting. He testified that his COPD was under control with breathers and inhalers. He had never been hospitalized for COPD. (Tr. 233). He had stopped smoking about a month before the hearing and was scheduled for gall bladder surgery later that month. He was not receiving any mental health treatment. (Tr. 234).

Volbert also had problems with his shoulder. He regularly had pain in his stomach that felt like hunger pains; he took medication for reflux. (Tr. 240). He was being tested for diabetes; his feet would regularly get numb. (Tr. 240-241).

Vocational Expert ("VE") Charles McBee also testified at the hearing. (Tr. 242-247). The VE testified that an individual of the same age, with the same education and work experience as Volbert, who was able to do a full range of medium work, except he could frequently climb ramps and stairs; could occasionally climb ladders, ropes or scaffolds; could frequently balance, stoop, kneel, crouch and crawl; and must avoid moderate exposure to pulmonary irritants, would not be able to perform Volbert's past relevant work, but he would be able to work as a dining room attendant, a production helper and a prep cook. There were significant numbers of these jobs in the national economy. (Tr. 242-245). At the light exertional level, this individual would be able to work as a merchandise marker, a sorter and as a palletizer. (Tr. 245). If the individual was limited to standing and walking frequently and lifting no more

6

than 10 pounds, he would not be able to perform light work. If he was further limited to only occasionally bending, squatting or climbing steps, he would not be able to work. (Tr. 247).

The VE testified that the individual would be subject to reprimand or dismissal if he missed one or more days per month beyond any sick time or vacation time, and if he was off task 10% or more of the workday. (Tr. 246).

## IV.     The ALJ Decision

The ALJ made the following paraphrased findings relevant to this appeal:

2. Volbert had the severe impairment of chronic obstructive pulmonary disease (COPD). (Tr. 18).

4. Volbert had the residual functional capacity to perform medium work except he could frequently climb ramps and stairs; he could occasionally climb ladders, ropes or scaffolds; he could frequently balance, stoop, kneel, crouch and crawl; and he must avoid moderate exposure to pulmonary irritants. (Tr. 22).

9. Considering his age, education, work experience, and residual functional capacity, there were jobs existing in significant numbers in the national economy that Volbert could perform. (Tr. 26).

Based on all of his findings, the ALJ determined that Volbert had not been under a disability since July 14, 2017, the application date. (Tr. 28).

## V.      Law & Analysis

### A.      Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. §§ 405(g), 1383(c)(3); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). "Substantial evidence" is not a high threshold for sufficiency. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Consolidated Edison Co. v.*

7

*NLRB*, 305 U.S. 197, 229 (1938)). Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision still cannot be overturned "'so long as substantial evidence also supports the conclusion reached by the ALJ.'" *O'Brien v. Comm'r of Soc. Sec.*, No. 19-2441, 2020 U.S. App. LEXIS 25007, at *15, ___ F. App'x ___ (6th Cir. Aug 7, 2020) (quoting *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003)). Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Jones*, 336 F.3d at 476. And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets this low standard for evidentiary support. *Rogers*, 486 F.3d at 241; *see also Biestek*, 880 F.3d at 783 ("It is not our role to try the case de novo." (quotation omitted)). This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, the court will not uphold a decision, when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant

8

evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10 CV 017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010). Requiring an accurate and logical bridge ensures that a claimant, as well as a reviewing court, will understand the ALJ's reasoning.

The Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform his past relevant work in light of his RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy. 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). Although it is the Commissioner's obligation to produce evidence at Step Five, the claimant bears the ultimate burden to produce sufficient evidence to prove that he is disabled and, thus, entitled to benefits. 20 C.F.R. §§ 404.1512(a), 416.912(a).

### B. Non-Severe Mental Health Impairments

Volbert argues that the ALJ erred by failing to recognize his mental health impairments as severe. ECF Doc. 11 at 6-11. At the second step of the sequential analysis, the ALJ considers whether the claimant has a "severe impairment." 20 C.F.R. § 416.920(a)(4)(ii), (c). A "severe impairment" is a medically determinable impairment that: (1) has more than a minimal effect on

9

an individual's ability to perform physical or mental work; and (2) is "expected to result in death [or] to last for a continuous period of at least 12 months." 20 C.F.R. §§ 416.909, 416.922; *see Salmi v. Sec'y of Health & Human Servs.*, 744 F.2d 685, 691 (6th Cir. 1985) ("'An impairment can be considered as not severe only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work.'" (quoting *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984))). If the claimant does not have a severe impairment, or combination of impairments, the regulations direct the ALJ to find that the claimant is not disabled. 20 C.F.R. § 416.920(c).

Step Two is a threshold inquiry "intended to 'screen out totally groundless claims.'" *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 576 (6th Cir. 2009) (quoting *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir. 1985)). The ALJ considered Volbert's mental health impairments at Step Two but found that they did not cause more than a minimal limitation in Volbert's ability to perform basic mental work activities. He stated:

> Additionally, with respect to his mental health impairments of affective and anxiety disorders, considered singly and in combination, do not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and are therefore nonsevere.
>
> Specifically, with respect to his mental health impairments, the record reflects that the claimant did not participate in any form of mental health treatment throughout the adjudicated period. In fact, at multiple appointments throughout the record, he declined referrals to mental health treatment, and at multiple depression screenings, he denied depression related symptoms. (1F/64-65/80/111 and 7F/53). In addition, he has not participated in intensive treatments, such as emergency or inpatient services.

(Tr. 19).

Volbert argues that the ALJ's non-severity finding is inconsistent with every mental health source opinion in the record. He argues that both the reviewing physicians and the consulting psychologist, Dr. Wuebker, found that he suffered from severe mental health

10

impairments that more than minimally affected his ability to perform basic work functions.  ECF Doc. 11 at 6.  I disagree with Volbert's characterizations of the record.

Volbert first argues that the ALJ should not have based his finding that Volbert's mental health impairments were non-severe upon Volbert's failure to seek treatment.  Volbert cites case law for the proposition that, for some disorders, the failure to seek treatment is simply a symptom of the disorder itself.  *White v. Comm'r,* 572 F.3d 272, 283 (6th Cir. 2009).  In *White,* the Sixth Circuit recognized that some mentally ill individuals do not comply with treatment due to their illness.  However, the Sixth Circuit found that the district court properly considered White's six month treatment gap as evidence of an alleviation of her symptoms.  *Id.*  Thus, the *White* decision actually supports the ALJ's finding that Volbert's lack of treatment was evidence that his mental health impairments were not severe.  Moreover, *White* should be distinguished because Volbert had not failed to comply with recommended treatment; rather, he had never sought treatment at all.         Moreover, Volbert has not offered any evidence that the mental health condition from which he claims to suffer is among those for which failure to follow treatment recommendations is a hallmark of the condition.

Volbert also argues that the ALJ's decision contradicted the opinions of the state agency reviewing physicians who found that his mental health impairments were severe.  Regarding the opinions of the state agency reviewing physicians, the ALJ stated:

> The State agency psychological consultants opined that the claimant has limits due to an affective and anxiety disorder, which include mild limits in understanding, remembering, and applying information; no limits in interacting and relating to others; mild limits in concentration perception and pace; and moderate limits in the ability to adapt or mange his own well-being in a work setting.  (1A and 3A).  Further, the State agency psychological consultants opined that the claimant is able to perform simple to more complex tasks in a static setting where pace can vary and changes should be infrequent.  (*Id.*)  This opinion is not fully consistent with the evidence of record, which reflects that the claimant has not required participation in any form of mental health

11

>treatment. Further, it is also not fully consistent with the consultative examination of record, which finds the claimant is able to adjust to changes in a work setting and does not provide any limitations with respect to adapting to work changes, such as a limitation to infrequent changes. (4F). Therefore, although the State agency consultants' mild findings in other areas are found to be persuasive, the finding of moderate limitations in the area of adapting or managing oneself is less persuasive. Specifically, based on the later submitted information and testimony, I have given less restrictive limitations in the area of adapting and caring for oneself, for the reasons stated above and explained below in the "paragraph B" criteria.
>
> \* \* \*
>
> The fourth functional area is adapting or managing oneself. In this area, the claimant has a mild limitation. Here, the consultative examiner noted that the claimant is capable of adjusting to changes in a work setting and the claimant reported no difficulty with adjusting to work settings (mentally) in the past. (4F and by testimony). Further, the claimant has been able to live independently and manage his household without significant mental limitations. (*Id.*). Thus, the claimant's ability to function independently, appropriately, effectively, and on a sustained basis is only slightly limited in this area.

(Tr. 20, 21).

The ALJ properly considered Dr. Wuebker's opinion as an examining psychologist and reconciled his opinion with those of the state agency reviewing psychologists. *See* 20 C.F.R. § 416.920c. Volbert reported that he had dealt with depression at times, but Dr. Wuebker noted that Volbert was not depressed during the examination and that his affect was appropriate. Volbert also reported anxiety, but Dr. Wuebker did not observe any symptoms of anxiety during the assessment. (Tr. 923). Dr. Wuebker's mental examination revealed that Volbert was clean and neat; he was cooperative during the examination; he had no difficulty responding to questions; his speech was 100% understandable; his thought content was logical and coherent; he was not depressed; his affect was appropriate; he denied any suicidal or homicidal ideation; he had no symptoms of anxiety; he denied any auditory or visual hallucinatory activity; he was oriented to person, place, time and situation; he was functioning in the average range of

cognition; his insight and ability to make common sense decision was marginally intact; and his prognosis for mental and health issues was stable. (Tr. 922-924).

Volbert argues that Dr. Wuebker's opinion was not inconsistent with the state agency reviewing physicians' opinions that he would have moderate limitations in the ability to adapt or manage oneself. I disagree. Dr. Wuebker opined that Volbert would have very few functional limitations due to any mental health impairments. Moreover, it is unclear what support the reviewing physicians had for their opinion of moderate limitations in the ability to adopt or manage oneself.

Volbert also argues that Dr. Wuebker found that Volbert would need assistance in managing any benefits – suggesting that he was limited in a functional domain. But Dr. Wuebker's finding was based on Volbert's own report that he had been sober for only a limited period. (Tr. 924). There was no other indication that Volbert would not be able to handle his own funds. In fact, Volbert testified that he lived on his own and *did* manage his own funds. (Tr. 229-230). Dr. Wuebker's mental status evaluation was essentially normal, and it was proper for the ALJ to rely on it to find that Volbert's mental health impairments were not severe.

Volbert argues that the ALJ improperly considered the lack of evidence of treatment and the opinion evidence when he decided that Volbert's mental health impairments were not severe. But the ALJ did not err either by taking into account Volbert's lack of mental health treatment or by the way he evaluated the mental health opinions in the record. I also note that Volbert has not cited any evidence from the treatment records that would support a finding that his mental health impairments *were* severe. To the contrary, treatment notes show that Volbert denied any mental health issues (Tr. 568); he did not seek any mental health treatment (Tr. 520); he did not testify that his mental health impairments prevented him from working; and his reported

activities of daily living did not suggest any functional limitations based on mental health impairments. Volbert has not identified any error in the ALJ's finding that Volbert's mental health impairments were not severe.

But even if the ALJ *had* erred in finding that Volbert's mental health impairments were not severe, such an error was harmless because the ALJ stated that he considered the non-severe impairments at later steps in the sequential evaluation. "After an ALJ makes a finding of severity as to even one impairment, the ALJ 'must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" *Nejat*, 359 F. App'x at 577 (quoting SSR 96-8p, 1996 SSR LEXIS 5 (Jul. 2, 1996)). So long as the ALJ considers all the claimant's impairments – severe and non-severe – in the remaining steps of the disability determination, any error at Step Two is harmless. *Nejat*, 359 F. App'x at 577 (citing *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)). Here, the ALJ had a basis for concluding that Volbert's mental health impairments were not severe. Volbert had not sought mental health treatment and declined it when it was offered. (Tr. 520, 568). Dr. Wuebker's examination findings were mostly normal and the ALJ thoroughly explained his consideration of the opinion evidence.

The ALJ was not required to find that Volbert's mental health impairments were severe, but he *was* required to consider them at later steps in the sequential analysis. And he did. At Step Two, the ALJ considered Volbert's mental health impairments and thoroughly explained his findings related to these conditions. (Tr. 19-22). At Step Four, the ALJ stated that he considered all of Volbert's symptoms and the extent to which they were consistent with the objective medical evidence. (Tr. 22). At page 10 of his decision, the ALJ specifically stated that he considered Volbert's COPD, *and his non-severe impairments,* when he found Volbert's RFC

14

limited him to medium exertional level work. (Tr. 25, emphasis added). Thus, even if the ALJ had erred by finding that Volbert's mental health impairments were not severe, any error was harmless because the ALJ stated that he considered Volbert's non-severe impairments at other steps of the sequential evaluation to the extent they were consistent with the objective medical evidence and other evidence.

### C. Medical Opinion Evidence

Volbert also argues that the ALJ failed to properly evaluate the opinion evidence from the agency's examining physician, Dr. Onamusi. ECF Doc. 11 at 11-15. At Step Four of the sequential analysis, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence. 20 C.F.R. §§ 416.920(e). On January 18, 2017, the Social Security Administration amended the rules for evaluating medical opinions for claims filed after March 27, 2017. *See Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844 (Jan. 18, 2017). The new regulations provide that the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s)." 20 C.F.R. § 416.920c(a). Nevertheless, an ALJ must "articulate how he considered the medical opinions and prior administrative medical findings" in adjudicating a claim. 20 C.F.R. § 416.920c(a). In doing so, the ALJ is required to explain how he considered the supportability and consistency of a source's medical opinion(s), but generally is not required to discuss other factors. 20 C.F.R. § 416.920c(b)(2). Consistency concerns the degree to which the opinion reflects the same limitations described in evidence from other sources, whereas supportability concerns the relevancy of objective medical evidence and degree of explanation given by the medical source to support the limitations assessed in the opinion. *See* 20 C.F.R. § 416.920c(c)(1)-(2).

15

The ALJ's decision showed how he considered the regulatory factors and found that Dr. Onamusi's opinion was inconsistent with his own objective findings:

> Dr. Onamusi's assessment is wholly inconsistent with his minimal findings on exam; for example, Dr. Onamusi noted on exam that the claimant was able to use his extremities for grasping, reaching, and pulling, and to perform fine motor tasks, but in his assessment, he limited the claimant to frequent use of the upper extremities without any explanation for this limitation. The claimant alleged some limitations with grasping at the hearing, but the evidence of record supports no such limitations, and there is no recent treatment for medically determinable upper extremity impairments. In addition, the evidence of record reflects that the claimant is able to perform greater postural activities than those proposed by Dr. Onamusi, such as his reports of bike riding, pulling weeds, cutting the lawn, and cleaning. (4F, 6F/18, and 7F/50). In addition, nothing supports a limitation to only 10 pounds of lifting. The claimant had normal strength and no specific impairments are supported that would require lifting restrictions below ten pounds. For these reasons, I find the consultative assessment is not fully supported by its own objective evidence and is not fully consistent with the other evidence of record, including the reported activities of daily living. Thus, I do not find the assessment to be persuasive.

(Tr. 24). The ALJ was required to explain how he considered the supportability and consistency of a Dr. Onamusi's opinion, and that is exactly what he did. *See* 20 C.F.R. § 416.920c(b)(2). He explained that Dr. Onamusi's examination showed minimal objective findings and his opinion did not explain why he limited Volbert to only 10 pounds of lifting and only frequent use of the upper extremities. In so doing, the ALJ questioned both the supportability and the consistency of Dr. Onamusi's opinion. That was precisely what the regulations required him to do.

Volbert argues that the ALJ should not have relied on Volbert's statements regarding activities of daily living to discount Dr. Onamusi's report. But the ALJ was required to consider all of the evidence – which necessarily included Volbert's own statements of his at-home functional abilities. Volbert asserts that his ability to function in his home was not reflective of his ability to sustain work five days a week, eight hours a day. ECF Doc. 11 at 12. That may be

true. But Volbert has not cited any evidence in the record showing that he was *not* able to sustain such work either. Even his own testimony on this issue was equivocal. (Tr. 232). And the burden was on Volbert to show that he could not sustain work for a normal workday. 20 C.F.R. § 416.912(a).

Finally, Volbert argues that Dr. Onamusi was the only physician who examined him and provided an opinion for his record and that evidence from the record supported Dr. Onamusi's opinion. But the ALJ was not required to assign any special weight to Dr. Onamusi's opinion because he examined Volbert. The ALJ was required to focus on the consistency and supportability of Dr. Onamusi's opinion, and he did. As already explained, the ALJ found that Dr. Onamusi's opinion was inconsistent with and unsupported by his own minimal exam findings or with Volbert's activities of daily living. Volbert has not identified any error in the ALJ's evaluation of Dr. Onamusi's opinion.

## VI. Recommendation

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Court affirm the Commissioner's final decision denying Volbert's application for SSI.

Dated: December 14, 2020

Thomas M. Parker
United States Magistrate Judge

---

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may waive the right to appeal the District Court's order. See *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981). See also *Thomas v. Arn*, 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).